1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEW MEXICO

3

ALFONSO HERNANDEZ,

4
             PLAINTIFF,

5
        vs.             NO:  CV-14-964 KG/SCY

6
ANDY FITZGERALD,

7
             DEFENDANT.

8

9

10       TRANSCRIPT OF EXCERPT FROM THE TRIAL – VOLUME I

11        BEFORE THE HONORABLE KENNETH J. GONZALES

12         TUESDAY, MAY 28, 2019; 8:44 A.M.

13           ALBUQUERQUE, NEW MEXICO

14

15

16

17     Proceedings reported by machine shorthand and transcript produced by Computer-Aided Transcription.

18

19

20

21

22

23  Reported By:  Danna Schutte Everett, CRR, RPR, RMR, CCR 139
                United States Court Reporter
24             100 N. Church Street, Las Cruces, NM  88001
                Phone:  (575) 528-1656  Fax: (575) 528-1645
25             dannadawn@comcast.net

1   FOR THE PLAINTIFF:

2       GORENCE & OLIVEROS, P.C.
        300 Central Avenue, Southwest
3       Albuquerque, New Mexico  87102
        BY:  MS. LOUREN M. OLIVEROS
4
    FOR THE DEFENDANT:
5
        LAW FIRM OF JONLYN M. MARTINEZ
6       Post Office Box 1805
        105 14th Street, Southwest
7       Albuquerque, New Mexico  87103-1805
        BY:  MS. JONLYN M. MARTINEZ
8
    ALSO PRESENT:  Mr. Brandon Cummings
9                  Ms. Kaia Oliveros
                   Mr. Alfonso Hernandez
10                 Mr. Andy Fitzgerald

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    * * * * * * * * * * * * * * * * * * * * * * * * *

2              THE COURT:  All right.  Ms. Oliveros, you may call

3    your first witness.

4              MS. OLIVEROS:  Your Honor, we call Andy Fitzgerald.

5              THE COURT:  All right.  Sir, if you may proceed to my

6    left into the witness stand.  Please raise your right hand to

7    be sworn.  Okay.

8         (Witness sworn.)

9              MS. HALL:  Please state your name, and spell your

10   first and last name for the court reporter.

11             THE WITNESS:  Andy Fitzgerald.  Andy, A-n-d-y,

12   Fitzgerald, F-i-t-z-g-e-r-a-l-d.

13             MS. HALL:  Thank you.  Have a seat, please.

14                PLAINTIFF'S WITNESS ANDY FITZGERALD,

15        after having been first duly sworn under oath,

16        was questioned and testified as follows:

17                       DIRECT EXAMINATION

18   BY MS. OLIVEROS:

19   Q.   Good morning, Mr. Fitzgerald.

20   A.   Good morning, counsel.

21   Q.   You were hired by the City of Albuquerque to work at the

22   transit department in what year?

23   A.   I believe 2008, 2009.  I can't remember it offhand.

24   Q.   2009 sound about right?

25   A.   2009, right.

Direct Examination - ANDY FITZGERALD

1   Q.   And you were hired as a transit officer, right?

2   A.   Yes, ma'am.

3   Q.   And as a transit officer, I take it you had all of the

4   training in the use of force and in the -- and how to apply

5   force when it was reasonable.

6   A.   Yes, ma'am.

7   Q.   And you would agree with me, Mr. Fitzgerald, that you

8   can't use any more force than is necessary.

9   A.   Correct.

10   Q.   And if you use more force than is necessary, then you

11   might harm someone, right?

12   A.   Right.

13   Q.   And you would agree with me that using more force than is

14   necessary endangers the safety of the person.

15   A.   Correct.

16   Q.   And if you are using more force than is necessary you

17   might really hurt somebody.

18   A.   Correct.

19        THE COURT:  Mr. Fitzgerald, let me just invite you to

20   adjust the microphone or feel free to scoot up just a little

21   bit so that you can speak into the microphone.

22        THE WITNESS:  How is that, Your Honor?

23        THE COURT:  All right.  That's much better.  Thank

24   you.

25   Q.   (By Ms. Oliveros)  Thank you.  And if you can't hear me,

Direct Examination - ANDY FITZGERALD

1   Mr. Fitzgerald, just let me know.

2   A.   Yes, ma'am.

3   Q.   Now, you were also informed and you understand that if you

4   hurt someone by using more force than is necessary, that you

5   would take responsibility for that.

6   A.   Correct.

7   Q.   And that's important because you need to be accountable

8   for what you do.

9   A.   Correct.

10  Q.   And you were proud of your service at the Albuquerque --

11  City of Albuquerque as a transit officer, weren't you?

12  A.   Yes, ma'am, I was.

13  Q.   And you're proud because you felt that you were a

14  reliable, honest employee?

15  A.   Yes.

16  Q.   And did you try to do your job with honesty and integrity?

17  A.   Honesty, integrity, and the best of my ability, ma'am.

18  Q.   And part of that honesty that you needed to have in your

19  job is to honestly and completely report the use of force,

20  right?

21  A.   Correct.

22  Q.   And that's something that there's no question that you

23  have to report when you use force on anybody as a transit

24  officer.

25  A.   Correct.

Direct Examination - ANDY FITZGERALD

1   Q.    And as a transit officer, you don't have the power to

2   arrest people, do you?

3   A.    We have the power to detain, ma'am.

4   Q.    And when you detain someone with handcuffs, that's like --

5   that's an arrest, isn't it?

6   A.    It's not an arrest, but applying hand restraints is the

7   safety of myself, other officers, and other people, as well,

8   around the surrounding area.

9   Q.    I'm sorry, what was that?

10  A.    Surrounding areas.

11  Q.    And in surrounding areas?

12  A.    Yes.

13  Q.    So as a transit officer, the City of Albuquerque armed you

14  with certain weapons and certain devices to help you if force

15  was needed, right?

16  A.    Yes, ma'am.

17  Q.    And part of that was your hands --

18  A.    No, ma'am.

19  Q.    -- that you can apply force by the use of your hands in

20  taking down folks, right?

21  A.    Yes.

22  Q.    So they didn't give you those, but that is one mechanism

23  for you to use force, is by your hands?

24  A.    Yes.

25  Q.    And if you use force with your hands, that has to be

Direct Examination - ANDY FITZGERALD

1   reported and documented.

2   A.   Correct, ma'am.

3   Q.   And you can't leave anything out.

4   A.   Correct.

5   Q.   And another tool that you have -- or you have the OC spray

6   or pepper spray?

7   A.   OC spray, handcuffs, and a baton, ma'am.

8   Q.   Handcuffs, OC spray, and a baton.

9   A.   Yes, ma'am.

10  Q.   And those are all different ways, if you need to, you can

11  use force on someone?

12  A.   In certain orders, ma'am.

13  Q.   You have the handcuffs because you can restrain folks if

14  you decide that's what you need to do, right?

15  A.   If that's the next step, if it escalates, ma'am.

16  Q.   And when you restrain someone with handcuffs, you can

17  detain them and they're not free to leave, right, at times?

18  A.   At times, yes, ma'am.

19  Q.   Okay.  Now, we're talking about the importance of

20  documenting the use of force.  And you agree with that, it's

21  very important, don't you?

22  A.   Yes, ma'am.

23  Q.   And that's because if you have an occasion to use force

24  when it's absolutely necessary, then that is to be reviewed by

25  your supervisors, isn't it?

Direct Examination - ANDY FITZGERALD

1  A.   Yes, ma'am.

2  Q.   And that's why you have to put -- you have an incident

3  report with the transit office, you have to fill out if you use

4  force?

5  A.   Yes, ma'am.

6  Q.   And you have to also indicate if force is used in your

7  logbooks, right?

8  A.   In our logbooks?

9  Q.   In your logs -- your daily logs.

10  A.   Daily logs, yes, ma'am.

11  Q.   So there's a couple of different ways that you are to

12  record when you use force.

13  A.   I'm not understanding, ma'am.  What are you saying?

14  Q.   There's a couple different ways that you have to record

15  things if you use force.  One is your daily logs, right?

16  A.   Yes, ma'am.

17  Q.   And then another way is an actual incident report,

18  correct?

19  A.   Yes.

20  Q.   Now, if APD is involved in a call, it's very important

21  that you cooperate with them, right?

22  A.   Correct.

23  Q.   And you work with the City of Albuquerque all the time

24  with respect to your detention of different folks and

25  especially trespass notices?

Direct Examination - ANDY FITZGERALD

1   A.   Yes, ma'am.

2   Q.   Because you have to call them because you don't have the

3   authority as a transit officer to issue citations.   That has to

4   be the police.

5   A.   Correct.

6   Q.   So you call them out and they're the ones that have to do

7   the official record.

8   A.   Yes, ma'am.

9   Q.   And you would agree with me that the information you give

10  the Albuquerque Police Department goes on the public record and

11  it's an official City document.

12  A.   Ma'am, I don't know about the public record, about that,

13  2012 I wouldn't know nothing about that.

14  Q.   Well, let's -- if you fill out a statement for APD, that's

15  an official statement, right?

16  A.   Yes, ma'am.

17  Q.   And that is to be 100 percent true and honest, isn't it?

18  A.   Correct.

19  Q.   And in those statements if you don't include everything

20  that's the truth, that would be a falsehood to the City,

21  wouldn't it?

22  A.   Yes, ma'am.

23  Q.   And so it's important for you when communicating with APD

24  to be honest and put everything that happened, especially with

25  respect to the use of force, in your statements.

Direct Examination - ANDY FITZGERALD

1  A.   Yes, ma'am.

2  Q.   And even if you're not asked for a statement, if you use

3  force and APD is involved, you're duty-bound to tell them about

4  it, aren't you?

5  A.   Yes, ma'am.

6  Q.   So you have to tell them verbally, and then you also may

7  be asked for an official City statement that you can write.

8  A.   Yes, ma'am.

9  Q.   Now, you would agree with me that you can only trust and

10  rely upon documents that are accurate and honest and complete,

11  right?

12  A.   Yes, ma'am.

13  Q.   And you have not been complete in all of your reports with

14  respect to your job when you were a City employee as the

15  transit officer, were you?

16  A.   That's not true, ma'am.

17  Q.   Isn't it true that in December, on December 2nd of 2012

18  you failed to report that you used force which resulted in a

19  broken window and handcuffing an individual?

20           MS. MARTINEZ:  Objection.

21           THE COURT:  Hold on.

22           MS. MARTINEZ:  Relevance.

23           THE COURT:  Okay.  Response?

24           MS. OLIVEROS:  Well, Your Honor, he just testified

25  that he is honest with all his reporting about the use of

1  force, and I have incidents from his personal record --

2  personnel record where he has not been.

3          THE COURT:  Okay.  Well, that will be the question

4  for the jury, but I'll overrule the objection.

5  Q.   (By Ms. Oliveros)  In December 2nd of 2010, you were

6  involved in an incident that occurred on First and Central,

7  that's around the transit area, where there was an altercation

8  and you used force against a woman and you never reported

9  that.  Right?

10  A.   Yes, I did, ma'am.

11  Q.   You're disagreeing with me?

12  A.   I am disagreeing with you, ma'am.

13  Q.   Well, you were disciplined for that, weren't you?

14  A.   I believe I was.

15  Q.   So the City of Albuquerque found that you didn't report

16  properly your use of force in that incident; isn't that true?

17  A.   I don't recall that, ma'am.

18  Q.   You don't recall that?  Well, why don't I hand you your --

19  the March 3rd Interoffice Memorandum and see if that refreshes

20  your memory.  Do you think that might refresh your memory?

21  A.   If I may look at it, ma'am.

22  Q.   Okay.  So refreshing your memory, are you familiar with

23  that?  If you look at this and it refreshes your memory about

24  what happened, then you can tell me about that and tell the

25  jury about it.

Direct Examination - ANDY FITZGERALD

1              MS. MARTINEZ:  Your Honor --

2              THE COURT:  All right, Ms. Oliveros, would you show

3     the item to Ms. Martinez.

4          (Ms. Oliveros provided Ms. Martinez with the document.)

5     Q.   (By Ms. Oliveros)  Just look at it and let me know when

6     you're finished.

7     A.   I remember this, but after the fact I was told to write a

8     statement --

9              THE COURT:  Okay.  Mr. Fitzgerald, just please let

10    Ms. Oliveros know when you've completed.

11             THE WITNESS:  Yes.

12    Q.   (By Ms. Oliveros)  Okay?

13    A.   When -- I finished it after -- after that incident, I was

14    told to write a statement on that matter.

15    Q.   So you agree with me that you -- do you agree with me that

16    you failed to properly document the use of force on

17    December 2nd of 2010?

18    A.   No, I don't agree.

19    Q.   And, Mr. Fitzgerald, on December 31st of 2012, you used --

20    were found to have used excessive force on someone and you

21    didn't document that use of force.  Do you recall that?

22    A.   No, ma'am, I don't.

23    Q.   You received a letter of warning on June 22nd of 2012 that

24    you detained a citizen for an extended amount of time without

25    notifying the Albuquerque Police Department and that there was

Direct Examination - ANDY FITZGERALD

1   an unnecessary detainment and that you used excessive force.

2   A.   Ma'am, I don't recall that at all.

3   Q.   You don't recall an incident where you were found to have

4   used excessive force against a man in Albuquerque?

5   A.   December 31st of 2012?

6   Q.   Yes.  Would it refresh your memory for me to show you --

7   A.   Yes, ma'am.

8   Q.   -- the Interoffice --

9        MS. MARTINEZ:  Counsel, can I see it first.

10       (Ms. Oliveros provided the document to Ms. Martinez.)

11  Q.   (By Ms. Oliveros)  I'm going to give this to you,

12  Mr. Fitzgerald, and just let me know once you read it if that

13  refreshes your memory.

14  A.   This was so long ago, I have no recollection of this,

15  ma'am.

16  Q.   So that doesn't refresh your memory?

17       THE COURT:  Was that a yes or a no?

18  A.   No, I don't.

19  Q.   (By Ms. Oliveros)  It doesn't?

20  A.   No.

21  Q.   You don't deny, Mr. Fitzgerald, do you, that you used

22  excessive force on a man in December of 2012?

23  A.   Ma'am, I don't know who was the man, what location it

24  happened at, at all.  Like again, that was so long ago, I have

25  no recollection of nothing that happened there.

Direct Examination - ANDY FITZGERALD

1  Q.   So you don't take responsibility for using excessive force

2  against this individual that you were given a warning for in

3  2012 --

4  A.   Again --

5  Q.   -- December?

6  A.   Again, ma'am, I have no recollection of that.

7            MS. OLIVEROS:  Your Honor, I'd like to mark this as

8  Plaintiff's 15, Your Honor, as impeachment.

9            THE COURT:  All right.  Ms. Martinez.

10           MS. MARTINEZ:  I need to see it again, Your Honor.

11           (Ms. Oliveros provided the document to Ms. Martinez.)

12           MS. MARTINEZ:  Your Honor, can we approach?

13           THE COURT:  You may.

14       (Bench conference on the record.)

15           MS. MARTINEZ:  So the document on the back is, I

16  guess, his log, but it's from December of 2010, and the date of

17  the letter is June of 2012, but the alleged incident happened

18  in December of 2010, and there's no description at all of the

19  individual, the location, the conduct, so this is meaningless,

20  and it certainly doesn't go with the information on the back.

21  So -- And my client doesn't recall the incident.

22           THE COURT:  Let me just take a look at what we have

23  here.  So we have what appears to be a four-page document.  And

24  the first page is an Interoffice Memorandum dated June 22nd,

25  2012, and it includes a back side, which is headed as Transit

Direct Examination - ANDY FITZGERALD

1   Department and a handwritten log and then what appears to be

2   page 3, headed as Findings, and then the fourth page I can't

3   make out the entire heading of it, but it includes a

4   conclusion.  So that's the document.

5           Ms. Oliveros --

6           MS. OLIVEROS:  Your Honor --

7           THE COURT:  -- relevance?

8           MS. OLIVEROS:  -- I think I can get him to lay a

9   foundation for the document because it's his signature.  That's

10  part of the issue with the authenticity of it.  I'm not saying

11  the details are wrong.  That's something I can have him verify.

12  It's relevant.  He's testifying he is required to log every use

13  of force he finds important, and he always did it, and then

14  that he didn't give -- and that there is a finding, and he got

15  a letter of warning because he failed to properly -- I'm sorry,

16  let me read this here.  (Reading) You were taught to report all

17  use-of-force incidents as a security officer and follow proper

18  detainment criteria as trained by APD.  You did not note the

19  incident in your daily report or incident report.

20          I just talked about that.  He said he always did

21  this.  This shows that he didn't.  He has -- He says he doesn't

22  recognize this or remember the incident, so it should be

23  admitted for impeachment value only, not as substantive

24  evidence, that it happened, to show that he did get this

25  warning and that he did -- and it was about a failure to log.

Direct Examination - ANDY FITZGERALD

1            THE COURT:  All right.  Well, you might have to

2  remind me, but does the witness remember this event?  It seemed

3  to me you attempted to claim -- One at a time.  You're

4  attempting to refresh his recollection using this document.

5            MS. OLIVEROS:  Right.

6            THE COURT:  The witness stated he did not recall the

7  event.

8            MS. OLIVEROS:  He said he didn't recall the event,

9  but I further am asking him about whether or not he recalls

10  being disciplined for it, and he's saying he doesn't remember

11  that.  It's his signature on this.  I mean, if it's premature

12  and I haven't laid the right foundation, I can ask him a few

13  more questions.

14            THE COURT:  So you would offer it as extrinsic

15  evidence of something?  What would that be --

16            MS. OLIVEROS:  Yes, I'm offering it for the purpose

17  of showing that he is not credible, that he doesn't remember

18  that it existed, and this just is for impeaching his

19  credibility on his supposed lack of personal knowledge.  I

20  think that's a proper purpose for it.

21            THE COURT:  He doesn't remember the events.  I don't

22  think you've established that he -- any sort of authentication

23  for the admission.  I understand what you're trying to do.

24            MS. OLIVEROS:  Right.

25            THE COURT:  So for now I'm going to sustain the

Direct Examination - ANDY FITZGERALD

```
 1  objection.  It's not admitted.  You've attempted to impeach
 2  him -- but he doesn't --
 3            MS. OLIVEROS:  Yes.
 4            THE COURT:  -- recall, at least that's his answer, so
 5  we're left with this.
 6            MS. OLIVEROS:  So if I may lay a further foundation,
 7  and I'll make an offer of proof at a break.
 8            THE COURT:  You can make an offer of proof.  I've
 9  just explained it.  It's in the record, but it won't be
10  admitted.
11            MS. OLIVEROS:  And I'll mark it as Plaintiff's 15,
12  Your Honor.
13            THE COURT:  Okay.  That's fine.
14            MS. OLIVEROS:  Then I would ask to lay a foundation
15  for his signature on it.
16            THE COURT:  Is there any dispute as to his signature,
17  Ms. Martinez?
18            MS. OLIVEROS:  She just said --
19            MS. MARTINEZ:  I don't know.  It looks like his
20  signature, Your Honor, but I don't know.
21            MS. OLIVEROS:  I think I need to do that in front of
22  the jury.
23            THE COURT:  Okay.  We can do it outside of the
24  presence of the jury just to establish the signature, but I'm
25  not going to allow the document itself.
```

Direct Examination - ANDY FITZGERALD

1          MS. OLIVEROS:  Okay.

2          THE COURT:  Exhibit 15.

3          MS. OLIVEROS:  Okay.  Thank you.  I've marked it.

4          THE COURT:  Okay.

5     (Open court.)

6  Q.  (By Ms. Oliveros)  Mr. Fitzgerald, you recall that you

7  were disciplined for the use of excessive force and your

8  failure to report that force, right?

9  A.  I believe, yes.

10  Q.  And you actually signed the letter of warning, you signed

11  that sometime in June of 2012, right?

12  A.  I signed something, but I don't know the year or the

13  month.

14  Q.  So it might have been in June of 2012, but you know you

15  signed a letter of warning about your failure to report your

16  use of force and also about your excessive use of force.  You

17  signed a letter of warning about those things.

18  A.  Yes, ma'am.

19  Q.  That those happened.

20  A.  Yes, ma'am.

21  Q.  You're just telling the jury that you don't remember the

22  person --

23  A.  I don't remember --

24  Q.  -- that was hurt --

25  A.  -- at all, ma'am, because there was no report made.  The

Direct Examination - ANDY FITZGERALD

1  only report -- There's a name who we have to put down, the

2  description, what he looks like, ma'am.

3  Q.    There's no report made.  What do you mean by that?  There

4  was no report?  There was no report for the excessive force?

5  A.    Not I recall, ma'am.  And I don't know who the

6  individual's name is.

7  Q.    But you know you hurt him.

8  A.    No, I didn't, ma'am.

9  Q.    So you don't take responsibility for that?

10 A.    I take responsibility, but I would not take responsibility

11 of excessive force.  I take responsibility for not -- for not

12 making a report out.

13 Q.    And you know that when you don't report that you use

14 excessive force or any force, you know that that creates a

15 situation where no one gets to review what you do unless

16 someone complains.  Right?

17 A.    Yes, ma'am.

18 Q.    So you take -- you take the power away from the

19 supervisors when you don't report it for people to look into

20 what happens and decide whether what you did was justified or

21 unconstitutional.  You take that away when you don't report it.

22 Isn't that true?

23 A.    I don't take away from anybody's position and power.

24 Q.    There were other times when you failed to log where you

25 were with the City of Albuquerque and you got in trouble for

Direct Examination - ANDY FITZGERALD

1   that.  Didn't you?

2   A.   Excuse me?

3   Q.   Other times when you failed to log where you were or what

4   you were doing and you got in trouble for that, didn't you?

5   A.   I got in trouble, but there would be a lot that would be

6   going on and you would have a tendency to forget.  It has

7   happened not only with myself, ma'am.

8   Q.   Well, we're only talking about you today and what you

9   remember about what you do.  So you don't -- You agree with me

10  that there were other times where you did not report or log

11  where you were or what you were doing so that your supervisor

12  would know.  You would agree with that?

13  A.   I would agree with that.  Again, there would be other

14  times things would be going on, you have a tendency to forget.

15  Q.   Well, you remember everything about what happened with

16  Mr. Alfonso Hernandez, don't you, on the day -- this day,

17  August 30th, 2012?  You remember everything about that, don't

18  you?

19  A.   Vaguely.

20  Q.   Isn't it true, Mr. Fitzgerald, that you only remember that

21  he supposedly assaulted you, and you don't remember anything

22  else about what happened?

23  A.   Ma'am, I can say this, ma'am.  Things happened so fast,

24  true, but I can't go back in time, and I'm not going back in

25  time 'cuz -- I'm not saying I don't want to remember, don't get

Direct Examination - ANDY FITZGERALD

1   me wrong, but things happened so fast.  If I could have done

2   something differently, yes.  I have no problem with that.

3   Q.   Are you saying you couldn't have done anything differently

4   than what you did?

5   A.   I'll say it again, counsel.  If I go back, turn hands back

6   of time, if I did things differently, I would.  I have no

7   problem with that.  I'm not saying I object to what you have

8   asked me.

9   Q.   You recall choking my client Alfonso Hernandez?

10  A.   Ma'am, if I remember choking him, I would, but in this

11  case, ma'am, no.

12  Q.   Isn't it true that you testified at your deposition that

13  (Reading) Alfonso had some sort of device that he was recording

14  me, and I asked him who are you?  Why are you recording me?

15         And you said, he jumped up and started swinging, you

16  tried to -- you tried to defend yourself, and that's all you

17  remember.  Did you say that?

18  A.   Yes, ma'am.

19  Q.   So that's all that you remember sitting here today when

20  you look back at the incident.  Is that all that you remember?

21  A.   What happened after that, there was contact made by the

22  plaintiff, Mr. Alfonso Hernandez.  I do remember that.

23  Q.   You claim that you saw -- you saw Mr. Hernandez, you saw

24  that he had a recording device, right?

25  A.   At the last minute, ma'am, I looked down.

Direct Examination - ANDY FITZGERALD

1   Q.   And before you saw that he had a recording device, you

2   never asked him to leave the area, right?

3   A.   No.  He was -- He asked me what time the bus come, so I

4   believe he's waiting on the bus at that stop.

5   Q.   Okay.  So you didn't know what he was doing?

6   A.   No.

7   Q.   Never at any time did you ask him to leave the area before

8   you tried to get his phone from him, right?

9   A.   No, ma'am.

10  Q.   You never did?

11  A.   No.

12  Q.   You never said, "Please move away."

13  A.   No.

14  Q.   And you never said, "Sir, please, you're standing too

15  close."  You never said that?

16  A.   No.

17  Q.   And you never said, "Sir, you're interfering with my --

18  this guy that I've got here, Manuel."  You never told that he

19  was interfering?

20  A.   I said something to that nature, but at that time he was

21  waiting on the bus.

22  Q.   So when you saw that he was recording, it was the fact

23  that he was recording, not that he might have -- not that there

24  was some interference, it was only the fact that he was

25  recording that made you want to stop him, right?

Direct Examination - ANDY FITZGERALD

1  A.    Yes, ma'am.

2  Q.    It had nothing to do with the guy you were detaining.

3  A.    Ma'am, I'm not a doctor.  I don't know what his mind frame

4  was.  I'm going to tell you the truth about that.  But in my

5  training in the military all these years, the way this society

6  is today, terrorists, I have training, terrorist training, they

7  have a tendency of taking pictures and recording locations,

8  people.  I take that very seriously.

9  Q.    In fact-- I'm sorry, I didn't mean to cut you off.

10  A.    And in this case, ma'am, to tell you the truth,

11  Mr. Hernandez shown an example of what he did, 'cuz like I

12  said, when I asked him who he was, "Who are you?" he never gave

13  me a name.

14  Q.    You did not want to give him a chance to answer you,

15  right?

16  A.    Ma'am --

17  Q.    That's what you said.

18  A.    -- no, I didn't say I didn't give him a chance.  I asked

19  him his name.

20  Q.    And you immediately went for his phone and took him down.

21  A.    No.

22  Q.    Mr. Fitzgerald, you said you took it very seriously that

23  Mr. Hernandez had a recording device, right?

24  A.    Correct.

25  Q.    And that put you on high alert.  Right?

Direct Examination - ANDY FITZGERALD

1   A.   Yes.

2   Q.   And you're saying that -- Do you think that if someone

3   records you in the city of Albuquerque when you're working as a

4   transit officer, that you can take their phone?  Is that

5   what -- Is that what you think?

6   A.   No, ma'am, I'm not saying that.

7   Q.   Well, those -- This wasn't the rule, was it?  The rule is

8   that people can record transit officers.

9   A.   The rule is -- I never seen it in black and white, ma'am,

10  in the City of Albuquerque.  I have not seen to this day,

11  ma'am, when it's a rule to record buildings, people, families,

12  et cetera.  Again, ma'am, I have training in this.

13  Q.   The training at the City of Albuquerque is that you have a

14  First Amendment right to record in public places, public

15  employees.  You know that, don't you?

16  A.   I thought it was a rule that I give you consent.

17  Q.   So in your mind Mr. Fitzgerald [sic] did not have your

18  consent to record you, right?  Is that what you're saying?

19  A.   He didn't have consent to sit by my detainee.  He did not

20  have consent to record what was going on, 'cuz, like I said, I

21  am trying to protect the scene.

22  Q.   You're trying to what?

23  A.   Protect the scene of the detainee.  Not only myself, my

24  partner, and people that was around.

25  Q.   When you -- When you saw that Mr. Hernandez had a cell

Direct Examination - ANDY FITZGERALD

1  phone and was recording you, that put you in a state of high

2  alert, right?

3  A.   Yes, ma'am, 'cuz I did not know who he was.

4  Q.   And that concerned you for your safety and the safety of

5  your family, right?

6  A.   Correct, ma'am.

7  Q.   And you weren't -- you weren't concerned about your

8  detainee's safety.  It was you and your family.

9  A.   No, ma'am.  I am concerned, myself, my detainee, and

10  others around that surrounding area of that area where it

11  happened.

12  Q.   Do you recall when I deposed you back in November of 2017?

13  Do you recall that?

14  A.   I'm sorry, ma'am.

15  Q.   Do you recall when I deposed you in Chicago in your

16  deposition in November of 2017?

17  A.   Yes, ma'am.

18  Q.   And I asked you --

19        MS. MARTINEZ:  Counsel, page and line, please.

20        MS. OLIVEROS:  Hold on one moment.

21        I'll have to come back to that, actually.

22  Q.   (By Ms. Oliveros)  Okay.  Mr. Fitzgerald, when you

23  took -- When you felt that you were on high alert, you went

24  into what you call survival mode, right?

25  A.   Yes, ma'am.

Direct Examination - ANDY FITZGERALD

1   Q.   And it's when you're in survival mode you don't know

2   what's going on around you, right?

3   A.   Correct.

4   Q.   That's what you said.

5   A.   Yes.

6   Q.   And when you're in survival mode, you're in a state of

7   rage?

8   A.   No, that's not what it means.

9   Q.   But you can't remember anything that happens when you're

10  in survival mode, right?

11  A.   Correct.

12  Q.   And that's because you are trying to protect yourself?

13  A.   Yes, ma'am.

14  Q.   And you claim that you don't remember anything that

15  happened after you went into survival mode with respect to what

16  happened with Alfonso Hernandez and yourself, right?

17  A.   Basically, yes.

18  Q.   And you went into survival mode as soon as you saw that he

19  was recording you and that he didn't give you his name, right?

20  That's -- That triggered you.

21  A.   No, it didn't trigger me.  It triggered me with the

22  camera, ma'am.  Like I said, today's society.

23  Q.   As soon as you saw the camera?

24  A.   Yes.  And I took that very seriously.  So I have to get

25  out of a situation before it escalates more.

Direct Examination - ANDY FITZGERALD

1  Q.   And you were going to stop the threat no matter what it

2  took.

3  A.   No matter what it took, yes, ma'am, because I have no -- I

4  don't -- I don't know what his intentions was with that video.

5  Q.   And stopping the threat might mean killing someone, right?

6  A.   No.

7  Q.   I'm going to play for you what's already been admitted as

8  Plaintiff's 2A.  Oh, I'm sorry, Plaintiff's 1.  I'll start with

9  Plaintiff's 1.  That's the cell that has video and audio of

10 your interaction with Mr. Hernandez.  Have you seen that?

11 A.   I've seen it, ma'am.

12 Q.   You've seen it before today, right?

13 A.   Yes, ma'am, I have.

14      MS. OLIVEROS:  We have practiced this, but I'm not

15 sure what --

16      THE COURT:  Well, let me just explain to the jury.

17 It's an audio-video exhibit that the Court has admitted with

18 the parties' agreement.

19      Ms. Oliveros, is this from the beginning or are you

20 taking segments of it?  Explain to the jury where if -- in the

21 jury you would start your demonstration.

22      MS. OLIVEROS:  We're going to start at -- We're

23 admitting the entire audio-video, Your Honor, with the cell

24 phone that's 4 minutes and 22 seconds, and we're going to start

25 by playing the first segments, and we'll -- I guess I'll

Direct Examination - ANDY FITZGERALD

 1  identify them as we go, and I'm going to be checking in with
 2  Officer Fitzgerald about what's happening in the frame that we
 3  start.
 4          So I'll start with 1A, Your Honor.
 5  Q.  (By Ms. Oliveros)  Now, Officer Fitzgerald, while they're
 6  getting that going --
 7          MS. OLIVEROS:  Let me know when you have it --
 8  Q.  -- this was daylight when you first encountered
 9  Mr. Hernandez, when you first encountered Alfonso Hernandez, it
10  was still daylight, but it was about 7:30 in the evening; is
11  that correct?
12  A.  Approximately, yes.
13  Q.  Okay.  And at that time it was you and Officer Powdrell
14  that were on the scene in downtown Albuquerque at the -- at the
15  transit area, right?
16  A.  Correct.
17  Q.  Okay.  And let me just go ahead and show you what's -- If
18  I can -- Let me just orient you on the ELMO.
19          MS. OLIVEROS:  Can I switch this over to the ELMO?
20  Just so the jury knows where we're at.
21          Okay.  So I have Plaintiff's Exhibit 5A on the ELMO,
22  and I don't know if you-all can see it on your screens.  Can
23  y'all see that?
24  Q.  So, Officer Fitzgerald, back in 2012 in downtown
25  Albuquerque, could you just please show the jury where is the

1    Alvarado transit center on this.  Could you mark that or just

2    point at it with your --

3    A.    (Indicating.)

4    Q.    You can just put your finger on the screen and show them.

5    A.    (Indicating.)

6    Q.    Okay.  So it's over here with this clock?

7    A.    Yes, ma'am.

8    Q.    Okay.  If you -- Okay.  And then the bus stop where you

9    had Manuel Bustamante, the detainee, where is that if you can

10   just show the jury by -- Do you know how to circle it within

11   the ELMO?

12            You have a little square.

13            MS. OLIVEROS:  Do you all see that?

14   Q.    I think if you put your hand up on the pencil on the

15   right-hand corner, Mr. -- Yes.  Okay.  Right.  Great.

16            So on Exhibit 5 you've got a red circle around --

17   that's the bus in that triangle where Mr. Bustamante, your

18   detainee, was, right?

19   A.    Correct.

20   Q.    Okay.  And you were there with Officer Powdrell, correct?

21   A.    Yes, ma'am.

22   Q.    In the beginning.

23            All right.  And then -- So there wasn't a whole lot

24   of room around -- There wasn't a whole lot of space around the

25   actual bus stop where you were at, and that's where the bus is

Direct Examination - ANDY FITZGERALD

1    stopped in front of, right there on First Street, right?

2    A.    Yes, ma'am.

3    Q.    All right.  And then you now have circled with a red

4    circle on the ELMO the Alvarado -- is that the transit center?

5    A.    The one with the big circle?

6    Q.    Yes.

7    A.    Yes, that's the transit center.

8    Q.    And that's where you and the transit officers have your

9    office and all your paperwork, and everything's just right

10   there, right?

11   A.    Well, yes.  Well, not where I circled it, but further

12   back.

13   Q.    So if you could tell the jury, and just put on directions,

14   where is north, where is south, east, and west, if you could

15   maybe -- To the north, if you can mark with, again, the pen,

16   put an N where the northern direction is on that intersection.

17   If you click again with --

18   A.    Okay.  It's been so long, I don't know where north, east,

19   south, west is.

20   Q.    Okay.  Maybe another witness might help us out.

21   A.    Okay.

22   Q.    Okay.  So your -- actually, your headquarters for the

23   transit office it's not where you circled where we can see,

24   right?

25   A.    I'm sorry?

Direct Examination - ANDY FITZGERALD

1   Q.   The headquarters where your transit office is, it's not on

2   this side of the building?

3   A.   No, it's not.

4   Q.   Okay.  So it's on the other side of the building?

5   A.   Where the buses come in and out.

6   Q.   And that's to the -- that's back behind -- to the south?

7   A.   Yes, right next-door to the Greyhound bus station, if I'm

8   not mistaken.

9   Q.   Well, let me see if maybe -- let me put up Plaintiff's

10  Exhibit 4E.

11        MS. OLIVEROS:  Which has been admitted, Your Honor.

12  Q.   Could you just -- Maybe I can do this.  Okay.  I have

13  cleared it.  I don't know why my -- I've got this glare here.

14        Okay.  Can you -- Looking at 4E -- Looking at 4E, can

15  you show the jury where your offices were, if it's possible to

16  with this photograph.

17  A.   Ma'am, it's so dark on my end --

18  Q.   Just the general area.  Just for orientation.

19  A.   Okay.

20  Q.   You can use that pen.

21  A.   It can help --

22  Q.   So you have a red circle and it's down First Street down

23  back there.  And that's where your office -- that's where the

24  office was?

25  A.   Yes.

Direct Examination - ANDY FITZGERALD

1   Q.   Okay.  And just for reference and distance, and I know

2   that you don't have a measurement, but about how far away is

3   that, if you could tell the jury?

4   A.   I couldn't even tell you, ma'am.

5   Q.   But it only takes a few minutes to walk there?

6   A.   Yes.

7   Q.   It's less than -- it's like maybe half of a block at the

8   most.

9   A.   Actually, that's one block.  Considering where the buses

10  go in and out, that's one block.

11  Q.   Okay.  So -- And it's always -- blocks are different

12  distances, but it's just -- it's just a short walk away, right?

13  A.   Give or take.

14  Q.   Yes.  And that's where you get your citations, and you

15  have an office there, and that's where you make your reports?

16  A.   Yes, ma'am.

17  Q.   And your supervisors are there?

18  A.   Yes, ma'am.

19  Q.   And then just for the orientation, what we're seeing here

20  in this particular Exhibit 4E, is this over here to the left,

21  is that the bus stop where this encounter with Mr. Hernandez

22  occurred?

23  A.   Yes, ma'am.

24  Q.   Okay.  So it's not the other ones on the other side.

25          All right.  Let me show you Exhibit 4A.  Can you tell

1   the jury, if you remember, where Mr. Hernandez was sitting when

2   you went to get his phone from him.  Where was he sitting?

3   A.   To --

4   Q.   Exhibit H.

5   A.   -- I believe (indicating).

6   Q.   You put a circle?

7   A.   Yes.

8   Q.   That's fine.

9   A.   Yes, ma'am.

10  Q.   And then where was the person you were writing up for

11  trespassing, Manuel?  Where was he?

12  A.   (Indicating.)  And at the time -- If I may, counsel, he

13  moved from -- Well, let me put this down.  1.  Based on further

14  over here, 2.

15  Q.   Okay.  So with the 1, you put where Manuel was?

16  A.   Yes, ma'am.

17  Q.   And that's where he was at first?

18  A.   Yes, ma'am.

19  Q.   Okay.  And then you put a 2 and a circle where Manuel

20  was -- where he moved to?

21  A.   Right.

22  Q.   When did he move from 1 to 2 based on your memory of what

23  actually happened?

24  A.   If I remember, when APD came, I don't know what officer

25  told him to move.  That's where he moved to.

Direct Examination - ANDY FITZGERALD

```
1    Q.   So after --
2    A.   Yes.
3    Q.   -- you tried to get the phone from Mr. Hernandez?
4    A.   Yes, ma'am.
5    Q.   When you saw Mr. Hernandez sitting on that bench and he
6    had the phone, what exactly was he doing?
7    A.   He was -- If I can remember -- Fidgeting, moving, and
8    that's when I saw the phone directly towards myself.
9    Q.   And where was -- where was the phone on his body?  How was
10   he holding it, that you can remember?
11   A.   Lower part of the body.  Lower -- Lower -- Right where
12   your hand is at, ma'am.
13   Q.   Would you please stand up --
14   A.   Yes, ma'am.
15   Q.   -- and show the jury how exactly you recall Mr. Hernandez,
16   if you can.
17   A.   If I may.
18   Q.   Just show them how you saw him holding the phone.
19              THE WITNESS:  If I may, jurors.
20              Your Honor, if I can use this seat for an example, if
21   it's okay with you.
22   Q.   Please.
23              MS. OLIVEROS:  I'm sorry, Judge.
24   Q.   (By Ms. Oliveros)  Okay.
25   A.   It was down here.
```

Direct Examination - ANDY FITZGERALD

```
1              THE WITNESS:  If you can hear me.
2   A.    It was down this low.
3   Q.    All right.  And you can visibly see that --
4   A.    Yes, we see it.
5   Q.    -- it was there.
6              He wasn't hiding it?
7   A.    No, he wasn't hiding it.
8   Q.    And when you say he was fidgety, what do you mean by that?
9   Can you show the jury what he was doing that made you say that.
10  A.    I -- When -- I can't recall if he was wearing a jacket or
11  not.  It's like he pulled it out like very hesitant.
12  Q.    Pulled what out?
13  A.    His phone.  Slowly put it down like this.  Can't remember
14  what type of phone it is.  He had it pointed direct- --
15  directly towards me.
16  Q.    Sure.  The phone was pointed at you to record you.
17  A.    Right.
18  Q.    Right?
19  A.    Correct, ma'am.
20  Q.    What's the fidgeting?  You said he was fidgeting.
21  A.    Again, ma'am --
22  Q.    Was that important to you, that he was fidgeting?
23  A.    Very important to me, ma'am.
24  Q.    Okay.  I've never -- This is the first time I'm hearing of
25  you saying --
```

1  A.  Yes.

2  Q.  -- he was fidgeting.

3       Show me by your movements what he did that appears he

4  was fidgeting.

5  A.  He was fidgeting, moving around, I guess, trying to adjust

6  himself, get a good view.

7  Q.  Okay.

8  A.  And then I come (indicating) the camera very slowly.

9  Q.  You're saying you saw the camera came out slowly?  It

10  wasn't out?

11  A.  No, it wasn't out.

12  Q.  Okay.  And the fidgeting, you showed the jury the

13  fidgeting that you saw.

14  A.  Yes, ma'am.

15  Q.  But are you saying that that was some evidence of a crime?

16  A.  No, I'm not saying evidence of crime, ma'am.

17  Q.  Well, do you -- do you agree with me, Mr. Fitzgerald, that

18  at that moment -- you had no reasonable suspicion that

19  Mr. Hernandez at that moment was about to commit a crime.

20  A.  Ma'am, I don't know what his mind frame was.  I can't

21  think for him.

22  Q.  That --

23  A.  In other words, a split second.

24  Q.  Well, you had -- this -- you had several minutes with him,

25  didn't you?

Direct Examination - ANDY FITZGERALD

1  A.   It's not all about the minutes.  It's not all about the
2  seconds.
3  Q.   My question to you, Mr. Fitzgerald, was, when you saw him
4  there with his phone and the way that you've described it to
5  the jury, was Mr. Hernandez -- did you think he was about to
6  commit a crime or did you have reasonable suspicion that he was
7  in the middle of a criminal conduct?
8  A.   Possibly.
9  Q.   What are the specific grounds for your statement and your
10  testimony to the jury that Mr. Hernandez with his phone was
11  committing or about to commit a crime?
12  A.   Interfering with my detainee.  That has no concern of him.
13  And I don't know if they were together or not.
14          MS. OLIVEROS:  Okay.  Can we play the video now, or
15  did I by putting up those -- Let's start it at -- Well, let's
16  just start it at the beginning, 1A.
17          THE COURT:  And this is Exhibit 1?
18          MS. OLIVEROS:  It's Exhibit -- Yes, Your Honor, it's
19  Exhibit 1, specifically 1A.
20      (Playing video.)
21  Q.   (By Ms. Oliveros)  Now, did you see yourself in this
22  portion of this video 1A, Mr. Fitzgerald?
23  A.   I believe that's me.
24          MS. OLIVEROS:  Back it up to where . . .
25  Q.   (By Ms. Oliveros)  Okay.  And is this on First and

Direct Examination - ANDY FITZGERALD

1   Central here where you talked about?

2   A.   Yes, ma'am.

3   Q.   All right.

4        (Playing video.)

5   Q.   Okay.  Is that you?

6   A.   Yes, ma'am.

7            THE COURT:  Okay.  Was that first exhibit 1A?

8            MS. OLIVEROS:  Yes.

9            THE COURT:  And the second, what was that?  Was that

10  also 1A or 1B?

11           MS. OLIVEROS:  Well, we haven't played 1B, Your

12  Honor, but I think what I'd like to do is just play all of 1

13  first and then go back and break it up.  I think that would be

14  a little easier for the jury.

15           So let's play Exhibit 1.  And let's make sure we have

16  the volume up.

17           THE COURT:  Okay.  And Exhibit 1 is 4 minutes and 22

18  seconds?

19           MS. OLIVEROS:  Yes, Your Honor.

20           THE COURT:  Okay.  Is there something else you can

21  get to while we're waiting for the video, counsel?

22           MS. OLIVEROS:  I think that it's -- should be

23  playing.  I apologize, Your Honor.  Okay.  Is it up on the

24  screens?  Okay.  It's up on their screens, so we should be able

25  to play it now.

Direct Examination - ANDY FITZGERALD

```
 1          (Playing video.)
 2    Q.   (By Ms. Oliveros)  Now, Mr. Fitzgerald, you recall what
 3    happened that day, don't you?
 4    A.   As much as I don't want to remember it, but I -- somewhat.
 5    Q.   Now, you -- you saw the video just now, as the jury did,
 6    and you remember that you never asked Mr. Hernandez to move.
 7    You immediately told him "Why are you recording me?"  And you
 8    didn't give him a chance to even respond.  You saw that.
 9    A.   Yes, I did.
10    Q.   And it wasn't about the other man.  It was about just the
11    fact that he was recording you.
12    A.   It was about the other man and just recording, ma'am.
13    Q.   Now, you understood in that moment that you had no
14    authority to confiscate or take Mr. Hernandez's cell phone,
15    right?  You knew that.
16    A.   If I knew that, ma'am, the policy were being placed.  His
17    phone was taken, but it was given back to him.
18    Q.   Do you remember at your deposition when I asked you, page
19    97, line 7 to 9:  "Did you believe you had the authority to
20    confiscate it?"  And you said, "No, I did not."  Do you
21    remember that?
22    A.   Yes.
23    Q.   That's what you said in your deposition.  And you didn't
24    have the authority to take Mr. Hernandez's phone, did you?
25    A.   No.
```

Direct Examination - ANDY FITZGERALD

1  Q.   But you did it anyway.  Right?

2  A.   Correct.

3  Q.   And you took it, and you were looking through it after

4  this, weren't you?

5  A.   Yes.

6  Q.   You wanted to see what he recorded, and you had your hands

7  on his phone, right?

8  A.   To see what I recorded, but I never found what was

9  recorded that time.  I don't know what type of phone he has

10  when I confiscated it.  I didn't look at what brand, what style

11  of phone it was.

12  Q.   But you were trying to get it?

13  A.   To get it to give to the police, what was found.

14  Q.   Well, it wasn't contraband.  You know that.

15  A.   Okay, ma'am.

16  Q.   You know that.  You didn't have a right to take it.

17  Right?

18  A.   Correct.

19  Q.   You were never going to give it to the police.  You just

20  wanted to look at it for yourself.

21  A.   That is wrong, ma'am.  Everything that transit works for,

22  if we find anything, we pass it on to the officers and they

23  decide what to do with it from there.

24  Q.   But you can't take property of citizens that you have no

25  right to take and give it to the police.

Direct Examination - ANDY FITZGERALD

1  A.   Again, ma'am, I got the phone.  I was going to pass it to

2  the officers.  And that's when I decided to give the phone

3  back.

4  Q.   And you remember that?

5  A.   Yes, I do.

6  Q.   Do you claim that Mr. Hernandez was standing up when you

7  first -- when you -- right after you saw him recording, you

8  claim he was standing up and that he threatened you?

9  A.   Vaguely.

10  Q.   Well, then let's play 1C.  Let's look at 1C.

11       (Playing video.)

12          MS. OLIVEROS:  Is that the whole thing?  Okay.

13  Q.   (By Ms. Oliveros)  In 1C, Mr. Fitzgerald, let me just get

14  this straight, though.  You are a security guard in this

15  video, you're a security guard for the City of Albuquerque and

16  not a police officer, right?

17  A.   Not a guard, ma'am.  An officer.

18  Q.   So when someone says "security guard," "City of

19  Albuquerque security guard," does that upset you?

20  A.   That's not my title, ma'am, at the time.

21  Q.   Well, you are there to protect the security of the

22  citizens riding buses, right?  It's your job.

23  A.   The buses, Alvarado transit is where, ma'am.

24          MS. OLIVEROS:  Okay.  Let's play 1 -- Was that 1C?

25          UNIDENTIFIED SPEAKER:  That was 1C.

Direct Examination - ANDY FITZGERALD

```
 1              MS. OLIVEROS:  Okay.  Play 1D, then.

 2         (Playing video.)

 3    Q.   (By Ms. Oliveros)  So you just saw in 1D, Mr. Fitzgerald,

 4    you were standing above Mr. Hernandez, weren't you, when you

 5    were questioning about "Who are you?"

 6    A.   Yes, ma'am.

 7    Q.   So he was sitting down, right?

 8    A.   Yes.

 9    Q.   And he never stood up and threatened you, did he?

10    A.   He stood up after the fact, ma'am.

11    Q.   After what -- After when?

12    A.   After "Why are you filming me?"

13    Q.   So you -- He was sitting down.  You're saying he stood up

14    and then you took him down to the ground immediately

15    afterwards, right?

16    A.   No.  He stood up and took a swing at me.  I couldn't tell

17    you which hand.

18    Q.   Did he take a swing at you?

19    A.   Yes, ma'am.

20    Q.   But you don't remember which hand?

21    A.   No, ma'am.

22    Q.   And you don't remember if he had a -- his hand was in a

23    fist or what?

24    A.   No, ma'am.

25    Q.   But you're saying that you remember that he took a swing
```

Direct Examination - ANDY FITZGERALD

1   at you?

2   A.   Took a swing, ma'am, and I blocked it.

3   Q.   Isn't it true that he never hit you, that he --

4   A.   Again --

5   Q.   -- that you're saying he swung at you and missed you?

6   A.   He swung at me and I blocked him, ma'am.  I blocked the

7   swing.

8   Q.   Isn't it true -- And that would be -- If he hit you,

9   that's a battery, right?

10  A.   Yes, ma'am.

11  Q.   And isn't it true that you testified that Mr. Hernandez

12  never battered you, right?

13  A.   If you're referring if I was injured, I was not injured,

14  but my understanding, to my understanding of what was told to

15  me, if you're swung and you block, that's a battery.  I was not

16  aware of that.  I took it as a noninjury since I blocked it.

17  Q.   So when -- At your deposition, when you said on 103, line

18  22, to all the way on 104, line 4, I asked you:  (Reading)

19  That's where I'm trying to understand.  Were you battered, no

20  bruised or battered?  It was just an assault, not battery.

21         Question line 24.  (Reading) So you never -- you

22  weren't battered by him?

23         Answer:  (Reading)  No.  No.  I didn't go to the

24  hospital, nothing.

25         Right?  You were never battered?

1   A.   Again, ma'am, my understanding, was told to me, that

2   battery on contact when I blocked -- blocked the swing, it is

3   told to me is a battery.  I did not go the hospital.  I was not

4   hurt in any way.

5   Q.   But if somebody batters you, that's very different from an

6   assault.  An assault's just a threat, and a battery means they

7   touched you, correct?

8   A.   If that's the definition of it, yes.

9   Q.   Well, I'm asking you.  Isn't it true, with your training

10  that you had, that you understand there is a big difference

11  between an assault and a battery?

12  A.   Yes.

13  Q.   And you know that an assault is a threat or a fear of a

14  threat, right?

15  A.   Yes.

16  Q.   And a battery is if someone touches you, right?

17  A.   Yes.

18  Q.   And those have very different consequences, don't they?

19  A.   I'm not sure.

20  Q.   Well, when you write up reports, it's important for you to

21  tell whoever it is that you want to look into this, if it's an

22  assault or a battery, that it's -- There's a big distinction in

23  the law, isn't there?

24  A.   Yes, ma'am.

25  Q.   And in your Answers to Interrogatories, those are the

1  sworn statements that you wrote and you provided in this case,

2  you claimed that Mr. Hernandez assaulted and battered you,

3  right?

4  A.   I can say the battery part.  The assault part, I didn't go

5  that far with it during that day.

6  Q.   But -- I understand you're saying that now, but when

7  you -- when you filled out you Answers to Interrogatory under

8  Number 13, the question about what happened with plaintiff, you

9  said, "The plaintiff assaulted and battered Mr. Fitzgerald."

10  You said that under oath, right?

11  A.   Ma'am, we're talking about two years ago.

12  Q.   Would it refresh your recollection to look at your answer

13  to that question, that sworn question and your answer since it

14  was two years ago?

15  A.   Two years ago, it won't be no need, ma'am.

16  Q.   So would it help you to look and see what you wrote under

17  oath?

18  A.   No, ma'am.

19          MS. OLIVEROS:   Your Honor, I move to admit the

20  answer and question to Interrogatory Number 13 as an admission

21  of a party opponent.

22          THE COURT:  Ms. Martinez.

23          MS. MARTINEZ:  No objection, Your Honor.

24          THE COURT:  All right.  You may go ahead.  What would

25  that be marked?

1            MS. OLIVEROS:  It would be Plaintiff's Number 16,

2  Your Honor.

3       (Plaintiff's Exhibit 16 admitted into evidence.)

4            MS. OLIVEROS:  And I will address the exhibit for the

5  other questions.

6  Q.   (By Ms. Oliveros)  Okay.  Let me show you what's been now

7  marked as Plaintiff's Exhibit 16.

8            Mr. Fitzgerald, will you -- you can go ahead and look

9  at your answer to Interrogatory Number 13.  Do you see that

10  now?

11  A.   Yes, ma'am.

12  Q.   And at least in that court document -- in document -- in

13  that evidence you said that the plaintiff assaulted and

14  battered you.

15  A.   I couldn't distinguish the two, ma'am.

16  Q.   You couldn't distinguish the two.  Well, that's just

17  wrong, isn't it?  That answer's not true, right?  Because I

18  want -- the jury needs to know.  That's wrong, isn't it?

19  A.   Are we talking about the assault or are we talking about

20  the battery or are we talking about both?

21  Q.   Your answer to Interrogatory Number 13.

22  A.   Again --

23  Q.   That is not a correct answer, is it?

24  A.   -- it's not a correct answer.

25            THE COURT:  Ms. Oliveros, so if you can just explain

Direct Examination - ANDY FITZGERALD

1  to the jury what the question was and the answer as it's in the

2  exhibit.

3          MS. OLIVEROS:  My question was -- You want me to read

4  the interrogatory, Your Honor?

5          THE COURT:  You can go ahead and publish the question

6  in the interrogatory as well as the answer.

7          MS. OLIVEROS:  Okay.  I will read it, Your Honor.

8  Q.   (By Ms. Oliveros)  Interrogatory Number 13,

9  Mr. Fitzgerald, and ladies and gentlemen of the jury, the

10 question, Interrogatory Number 13:  (Reading) Please state

11 your contention, including the reasons therefore whether on or

12 about August 30, 2012, you were authorized to detain plaintiff

13 as described in his Complaint whether -- and I need 1, that's

14 [sic], that's a mistake, I think -- (Reading) or not you agree

15 that you did so detain plaintiff and whether you contend that

16 you were authorized to use force against plaintiff whether or

17 not you agree that you used any force.

18         Answer:  (Reading)  The plaintiff assaulted and

19 battered Mr. Fitzgerald.

20         That was -- That was your answer under oath in your

21 interrogatories, correct?

22 A.   Yes, ma'am.

23 Q.   And that's not true?

24 A.   That's not true, but the battery part I will.  What was

25 told prior distinguish the two to -- prior to today.

1   Q.   You didn't know the difference?

2   A.   No, ma'am.

3   Q.   And you said that the plaintiff swung at you, right?

4   A.   Yes, ma'am.

5   Q.   Now, you mentioned earlier Officer Galvan.  He's going to

6   testify here today, but he came up right after this incident

7   when you had detained plaintiff and he was sitting in

8   handcuffs, right?

9   A.   Yes, ma'am.

10  Q.   And you told Officer Galvan what happened, right?

11  A.   Yes.

12  Q.   And it was important to you that you told him everything

13  and that you were honest with him, correct?

14  A.   The best to my knowledge, ma'am.

15  Q.   And you told Officer Galvan that you -- Let me make sure

16  I'm clear on this.  You told Galvan that you had told

17  Mr. Hernandez to move before you went to take his phone.

18  That's what you told Officer Galvan, isn't it?

19  A.   Ma'am, are we talking about -- I can't turn the hands back

20  in time, ma'am.

21  Q.   Well, that's what --

22  A.   I don't know -- I don't know the conversation because,

23  ma'am, that was so long ago.

24  Q.   You don't remember?

25  A.   I don't remember from word from word.

Direct Examination - ANDY FITZGERALD

1   Q.   Well, you knew when you were talking about -- to Officer

2   Galvan that he was going to write a Criminal Complaint on

3   Manuel, right?  You knew that.  You were giving him information

4   for his Complaint.

5   A.   Okay, ma'am.  Manuel, was that his name?  Manuel.

6   Q.   The guy at the bus stop that was detained.

7   A.   Okay.  That was something more that myself and Officer

8   Powdrell did not know about him.

9   Q.   Okay.

10  A.   We did not know.  All we -- All -- Manuel was going to get

11  a criminal trespass, but it escalated to something else we did

12  not know about.

13  Q.   You were not involved -- or you don't know anything about

14  the charges against --

15  A.   Manuel, no, ma'am, we didn't.

16  Q.   But you were interviewed by Officer Galvan about what

17  happened that day, right?

18  A.   Yes.

19  Q.   And it was important for you to tell him the truth about

20  what happened between you and Mr. Hernandez.

21  A.   Yes.

22  Q.   And you told him that -- You told Alfonso to get back, to

23  get away from you.  You told him that, didn't you?

24  A.   As I stated, ma'am, we're talking about 2012.  This is

25  2019.  I don't have no recollection of that, of the

1   conversation in hand.

2   Q.   So you don't -- you don't disagree with me that you

3   claimed to have told Officer Galvan --

4   A.   I'm not disagreeing.  I'm not agreeing.  I just stated, I

5   don't have no recollection.

6   Q.   And you told Officer Galvan in his investigation of Manuel

7   that Alfonso continued to videotape and remained in close

8   proximity after you told him to get back.  You told him that,

9   right?

10  A.   I have no recollection of the conversation, ma'am.  That

11  was so long ago.

12  Q.   Well, that's not true, is it?  You never asked --

13  A.   I can't say it's true; I can't say it's not true.

14  Q.   Well, you saw the video.  You never asked Alfonso --

15  A.   I never asked him.

16  Q.   Okay.  You never asked him to get back, and he didn't get

17  closer after you asked him to get back, because that never

18  happened, right?

19  A.   I don't believe so, ma'am.

20  Q.   And when you talked to Officer Galvan, you just told him

21  that you feared a battery, not that one happened, right?

22  A.   Ma'am, I'm not going to let nobody swing on me and just

23  stand there and take it.  I'm going to defend myself the best

24  way as possible.  Not saying I'm proud of doing it, not saying

25  I'm happy about it, not saying any of those things, but I tried

Direct Examination - ANDY FITZGERALD

1    to de-escalate the situation in hand.

2    Q.    My question was, Mr. Fitzgerald, you did not tell Officer

3    Galvan that Mr. Hernandez supposedly swung at you.  You didn't

4    tell him that.

5    A.    Ma'am --

6    Q.    Right?

7    A.    Ma'am, seven years ago, a lot of words around that area.

8    I don't know if I did or if I didn't, but I did write in my

9    statement, APD's form that was submitted by me.

10   Q.    That was later.

11   A.    Yes, ma'am.

12   Q.    That was after you had time to think about things, right?

13   That was later?

14   A.    Yes, ma'am.

15   Q.    It was the next day?

16   A.    Ma'am, seven years ago, but it is written.  I can't say it

17   was the next day.  I can't say it was that day.

18   Q.    But what you told Officer Galvan, you told him on the

19   scene right after all this happened, and that was the truth,

20   right, that you were never touched by Mr. Hernandez?

21   A.    It's in my statement, ma'am.

22   Q.    So you remember that?

23   A.    You also asked me the time to think about it.  I had to

24   collect all of my thoughts after that incident, ma'am.

25   Q.    Now, having looked at the video, Mr. Fitzgerald, you got

Direct Examination - ANDY FITZGERALD

1   Mr. Hernandez on the ground and he was completely in handcuffs

2   before you left him, right, and you moved to Manuel?  You had

3   handcuffs on right away, right?

4   A.   I didn't place the handcuffs on him, ma'am.  My partner

5   did.

6   Q.   You guys did that together, didn't you?

7   A.   We did it together, but not my handcuffs.

8   Q.   So you know he was in handcuffs -- Moments after you got

9   him to the ground you got the handcuffs on, right?

10  A.   Yes, ma'am.

11  Q.   And when you took him to the ground you didn't have any

12  difficulties getting the handcuffs on him, right?

13  A.   If I looked at the video correctly, my partner said, "Give

14  him the other hand."  He had his hand -- I can't remember which

15  one, but he had it tucked under.

16  Q.   Well, he wasn't resisting or threatening you-all in any

17  way, right?

18  A.   Resisting, yes.

19  Q.   Do you recall in your deposition --

20          MS. OLIVEROS:  On page 37, counsel, lines 12 to 15.

21  Q.   -- I asked you the question:  "Do you recall that

22  Mr. Hernandez was struggling in any way when you were trying to

23  get the handcuffs on him?"

24          Your answer:  "No, ma'am."

25          Do you recall that testimony under oath at your

Direct Examination - ANDY FITZGERALD

1    deposition?

2              MS. MARTINEZ:  Your Honor, out of completeness, if

3    she could read from lines 15 to 20.

4              THE COURT:  You can do so on your examination of the

5    witness.

6              But for now you may move on, Ms. Oliveros.

7    Q.   (By Ms. Oliveros)  Do you recall that testimony?

8    A.   Two years ago.  All I know, he had his hand tucked under

9    him, ma'am.  That's all I know.

10   Q.   I'm sorry --

11   A.   Struggling.

12   Q.   -- I didn't hear you.

13   A.   You asked me was he struggling.  All I know, he had his

14   hands -- his hand -- I'm sorry -- underneath him.

15   Q.   Well, he wasn't threatening you and he wasn't threatening

16   Officer Powdrell, right?

17   A.   I don't believe he was, ma'am, but we was -- we was trying

18   to stop whatever.

19   Q.   He wasn't threatening you or Mr. Powdrell when you were

20   getting his handcuffs on him, right?

21   A.   We tried to stop the threat, ma'am.  Like I said, he had a

22   cell phone.

23   Q.   He didn't threaten you physically in any way, right?

24   A.   Ma'am, he took a swung [sic] at me and I blocked it.

25   Q.   I understand that's what you're saying now.  But I'm

Direct Examination - ANDY FITZGERALD

1   saying, once he was in his handcuffs and when you're getting

2   the handcuffs on and when he was in them, he never threatened

3   you physically at all.

4   A.   After that, no.

5   Q.   Never?

6   A.   No.

7   Q.   When he was on the ground.  Because you're saying the only

8   time that he supposedly did something to you, that was when he

9   was standing up.  Right?

10  A.   Right.

11  Q.   So when he was on the ground, no threats at all?

12  A.   No.

13  Q.   Not physically, right?

14  A.   No.

15  Q.   And not verbally?

16  A.   No.

17  Q.   There was nothing that he did that we didn't see that you

18  thought was threatening to you?

19  A.   Right.

20  Q.   No?

21  A.   No.

22  Q.   And there's nothing that Mr. Hernandez did that you saw

23  that he was threatening Officer Powdrell, right?

24  A.   No, ma'am.

25  Q.   Or anyone else?

1   A.   No, ma'am.

2   Q.   Now, I just want to clarify.  You said that your

3   deposition was two years ago.  It was in November of 2000- --

4   November 8th of 2017.  Do you recall that?

5   A.   Yes, and it was not a very good one after I saw you,

6   ma'am.

7   Q.   It was what?

8   A.   It was not a very good one after I saw you.

9   Q.   That day?

10  A.   Yes, ma'am.

11  Q.   Because I took your deposition?

12  A.   No, not you personally.  Right after I left from you.

13  Q.   Well, that has nothing to do with this lawsuit.

14  A.   No, ma'am.

15  Q.   All right.  Now, do you claim, Mr. Fitzgerald, that the

16  plaintiff, Mr. Hernandez, is responsible for you losing your

17  job?

18  A.   All I can say, ma'am, I thought I was doing the right

19  thing.

20  Q.   Do you remember at your deposition when you testified, on

21  page 134, lines 20 to 21:  "Yes, I did lose my job behind it

22  because of his actions"?  Do you recall that testimony?

23  A.   Vaguely.  His conduct.

24  Q.   So you blame him for you losing your job at the City of

25  Albuquerque?

Direct Examination - ANDY FITZGERALD

1   A.   Yes.

2   Q.   And not the other -- not anything else that you did while

3   you were there?

4   A.   None that I can think -- None that I can say or none that

5   I can think of, ma'am.

6   Q.   And do you also blame Mr. Hernandez for your -- a divorce

7   from your wife?  Do you blame him for that, too?

8   A.   That would be a separate -- separate issue, ma'am.

9   Q.   Do you blame him for something that happened to you and

10  your family, that he -- Did he cause a breakup?

11  A.   Again, ma'am, that is a separate issue.

12  Q.   Well, remember at your deposition you were shaking your

13  head and I asked you "Why did you do that?"  Page 134, lines 11

14  to 16.  And you said -- You had been shown the video.  You said

15  "Because I didn't want to see it.  That's what caused -- that's

16  what caused my family part of it."

17          I asked you:  "Do you blame Mr. Hernandez for that,

18  what happened to you?"

19          You answered:  "Yes.

20          "Why do you blame him?

21          "Because, ma'am, what myself and Mr. Powdrell had

22  done should never had come to extreme.  I'm at a loss for

23  words.  Yes, I did lose my job behind it because of his

24  actions."

25          And then at lines 22 to 25:  "What actions do you

Direct Examination - ANDY FITZGERALD

1  feel that Mr. Hernandez did that were responsible for you to

2  lose your job and your family?

3           "His actions were intervened.  When he was asked to

4  move, he should have moved.  When I asked him, 'Who are you?'

5  he didn't identify himself."

6           Do you recall that testimony?

7  A.   Two years ago, that was a lot with you, counsel.

8  Q.   But you did blame Mr. Hernandez for something -- your loss

9  of your family or your divorce, right?

10 A.   Not only with him, but within myself, ma'am.

11 Q.   You didn't say that at your deposition, did you?

12 A.   No, I did not.

13 Q.   But you got your job -- you appealed your termination with

14 the City and you got your job back and they paid you $5,000

15 this year, right?

16 A.   I didn't get my job back, ma'am.

17 Q.   So they cleared your name, that you weren't fired, right?

18 A.   They changed it to a resignation, ma'am.

19 Q.   And that was in 2019, from -- You were terminated in 2013,

20 right?

21 A.   Yes, ma'am.

22 Q.   You said because of -- because of this, supposedly, or a

23 part of this.  But in 2019 the City gave you -- allowed you to

24 say you resigned, right, for --

25 A.   That's what I was told, ma'am.

Direct Examination - ANDY FITZGERALD

1    Q.   Well, you won it that day.  You knew that you -- that's

2    what you were going for.

3    A.   Ma'am, I had no idea they was still working on this.  I'm

4    in one state.  Here I am in New Mexico.  I did not know they

5    was working on that still.

6    Q.   And so while the City -- Oops, excuse me.

7         So the City gave you -- they cleared your name and

8    they gave you $5,000, right, as some kind of settlement?

9    A.   I believe that's what it was, ma'am.

10   Q.   And do you have any idea why they would do that right now,

11   in 2019 --

12   A.   Ma'am --

13   Q.   -- the City would settle?

14   A.   Ma'am, I'm not in this state anymore.  I couldn't even

15   answer that for you.

16   Q.   Well, they're going to pay the -- they're going to pay any

17   judgment in this case, right?

18              MS. MARTINEZ:  Objection, Your Honor.

19              THE COURT:  Sustained.

20              Ms. Oliveros, just about how much longer do you have

21   with this witness?

22              MS. OLIVEROS:  Probably 15 or 20 minutes, Your Honor.

23              THE COURT:  Okay.  I'm just seeing we're at five

24   minutes till noon where we would ordinarily take a lunch break,

25   but ten more minutes.  So we will not take a lunch break.  It's

Direct Examination - ANDY FITZGERALD

```
 1   five till, but you may wrap up.  You have ten more minutes.
 2             MS. OLIVEROS:  Okay.
 3             THE COURT:  Okay?
 4             MS. OLIVEROS:  Thank you, Your Honor.
 5   Q.   (By Ms. Oliveros)  Officer Fitzgerald, you heard in the
 6   video clip, you said to Manuel, "I'm going to unleash on you."
 7   Do you recall that?  That was your voice, wasn't it?
 8   A.   I believe it was.
 9   Q.   Excuse me?
10   A.   I believe it was.
11   Q.   That was your voice, and you said to Manuel, "I'm going to
12   unleash on you," right?
13   A.   Yes.
14   Q.   And you said that because -- Did you see him with a phone?
15   A.   He -- He didn't have a phone, ma'am.
16   Q.   Manuel?
17   A.   No.
18   Q.   So what -- why were you threatening him?
19   A.   That was unprofessional on my part, I do admit.
20   Q.   Well, that's a threat of force, right?  You were
21   threatening to physically use force against him, weren't you?
22   A.   No.
23   Q.   What did you mean by when you said, "I'm going to unleash
24   on you"?  What did you mean?
25   A.   He wasn't touched at all, ma'am.  At all.
```

Direct Examination - ANDY FITZGERALD

1  Q.   What did you mean by that, Mr. Fitzgerald?

2  A.   I guess when he moved he made me mad by moving.  He moved,

3  and I guess out of -- I wasn't thinking at the time because

4  Mr. Hernandez -- after I was upset about the phone camera.

5  Everything was going on around myself.  I was already upset.

6  Q.   You were on red alert?

7  A.   Yes.

8  Q.   And you were -- you're saying you didn't know what was

9  going on?

10 A.   No, I'm not saying -- I said besides what was going on, I

11 tried to grasp it all.

12 Q.   Were you in survi- -- Where you in what you call survival

13 mode right then?

14 A.   Yes, ma'am.

15 Q.   So in survival mode, you got Mr. Hernandez on the ground.

16 He was -- He was handcuffed, right?

17 A.   Yes, ma'am.

18 Q.   And then you moved to Manuel, and you threatened him by

19 saying you were going to unleash on him, right?

20 A.   Yes.

21 Q.   And then you moved back to Mr. Hernandez after that,

22 right?

23 A.   I believe I did, ma'am.

24 Q.   And that's when you put your hands on him, right?

25 A.   Ma'am, choking him, no, because the bus was right there.

Direct Examination - ANDY FITZGERALD

```
 1   I did not choke him.

 2   Q.   You had your hands around his neck, didn't you?

 3   A.   Hands around his neck, no.

 4   Q.   Do you remember what you did right then or not?

 5   A.   Ma'am, survival mode.  I have no recollection of this back

 6   in 2012.

 7   Q.   You had your hands on Mr. Hernandez's throat --

 8   A.   Okay.

 9   Q.   -- and never let go, did you?

10   A.   Ma'am, survival mode.  I have not choked Mr. Hernandez.

11   Q.   And Akeem Powdrell was right there --

12   A.   Ma'am --

13   Q.   -- and he --

14   A.   -- I don't remember.  I wasn't paying attention.

15   Q.   -- he called your name 11 times and you did not stop

16   choking Mr. Hernandez, did you?

17   A.   I did not choke him and I was not paying attention to

18   Akeem and I was not keeping count of how many times he called

19   my name.

20   Q.   You don't recall because you were in survival mode.

21   That's what you said in your deposition, isn't it?

22   A.   Yes, ma'am.

23   Q.   And you could have killed him.  You know that.

24   A.   Are you asking me --

25   Q.   Yes.
```

1   A.   -- if I could have killed him?

2   Q.   Yes, you could have killed him.

3   A.   No.  That is not in my mind frame, ma'am.

4   Q.   Now, Officer Fitzgerald, after this assault, or you can

5   call it whatever you want, after your encounter with

6   Mr. Hernandez, you never told anybody, you never came forward

7   and told anybody the truth about the fact that you laid your

8   hands on him, did you?

9   A.   Laid my hands on him, no.

10  Q.   Now, afterward there were many minutes where Mr. Hernandez

11  was in handcuffs and sitting there.  And you knew that he

12  wasn't intoxicated or anything, right?

13  A.   From my -- Excuse me.  From my understanding, I don't know

14  who asked him, I can't say, but the officers asked him -- no,

15  either asked or told him that his eyes were red and he smelled

16  like liquor.  That part, no.

17  Q.   That wasn't you, then?

18  A.   That wasn't me.  I didn't ask that question.

19  Q.   To your personal memory?

20  A.   Yeah, he wasn't liquored up, but all the officers say he

21  was liquored up and his eyes was red.

22  Q.   But that wasn't true, was it?

23  A.   No, ma'am, it wasn't.

24  Q.   And you remember that, that specifically that he didn't

25  smell of alcohol and he didn't appear to be drunk to you,

1    right?

2    A.    Unless he came in contact with Mr. Bustamante, that's the

3    only way, ma'am, that the smell, but he wasn't liquored up at

4    all.

5    Q.    And you never saw him come into close contact with

6    Mr. Bustamante like that?  What you saw --

7    A.    What I saw, I -- I haven't seen it.

8    Q.    You never saw it?

9    A.    No, ma'am.

10   Q.    Now, you heard your attorney talk about Michael Herrick.

11   Do you know who that is?

12   A.    Ma'am.

13   Q.    Michael Herrick.

14   A.    It's not a personal friend.  I never seen him in a day in

15   my life.  Never.

16   Q.    And you never saw him at the bus stop during when you had

17   your encounter with Alfonso, right?

18   A.    No.

19   Q.    No?

20   A.    I wasn't panning in that direction.  No.

21   Q.    He's a white man and he's in the video, but you did not

22   see him?

23   A.    No.  After the fact, that's when I saw him, but I never

24   seen him, know his name, who he works for, anything.

25   Q.    So as far as you're concerned, what happened between you

Direct Examination - ANDY FITZGERALD

1  and Mr. Hernandez, Michael Herrick has absolutely nothing to do
2  with it?
3  A.   No, ma'am.
4  Q.   No, ma'am, he has nothing do with it?
5  A.   No, ma'am, has nothing to do with it.
6  Q.   So -- And your decisions to handcuff him and detain him
7  and take him down, that had nothing to do with Michael Herrick?
8  A.   No.  Not at all.
9  Q.   And you agree, like I think we went over this, but if --
10 if you harm someone, even if you're in survival mode you're
11 responsible for that, aren't you?
12 A.   Yes.
13              MS. OLIVEROS:  I pass the witness, Your Honor.
14              THE COURT:  Okay.  It is just about five minutes
15 after noon.  Ladies and gentlemen, thank you for your attention
16 this morning.  We went fairly long, but we'll take a break at
17 this time.  Please be back in the deliberation room so we can
18 get started again by five minutes after 1:00.
19              I have to give you the instruction similar to what I
20 gave you originally.  Please do not discuss the case while
21 we're on break.
22              All right.  Please rise for the jury.
23      (Jury out at 12:07 p.m.)
24              THE COURT:  All right.  Mr. Fitzgerald, you may step
25 down.

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  All right.  Does counsel need to be heard

3     on anything at this particular time?

4          MS. OLIVEROS:  I don't think so.

5          THE COURT:  Sir?

6          THE WITNESS:  No, I didn't mean it.  I thought it had

7     wheels.  I was like oh, oh.

8          THE COURT:  Oh, that's fine.  You may return to

9     counsel table.

10          MS. MARTINEZ:  No.  Thank you, Your Honor.

11          THE COURT:  Nothing from counsel?

12          Ms. Oliveros?  Nothing?

13          MS. OLIVEROS:  Oh, I'm sorry.  Yes, sir.

14          THE COURT:  Okay.  Let me just ask if there's going

15     to be additional video evidence presented, I would just ask

16     counsel to be a little more timely in getting it started.  I

17     understand there's no perfect system, but if we can just avoid

18     the delay in getting it started that would be very helpful.

19          All right.  We'll be in recess.

20       (Court stood in recess at 12:08 p.m. and resumed at

21       1:07 p.m.)

22          THE COURT:  Okay.  We don't have Louren Oliveros just

23     yet?

24          MS. KAIA  OLIVEROS:  Not yet.

25          THE COURT:  Okay.  Well, we'll just wait until she

1    comes back in, so we'll be in recess just a moment.

2         (Court stood in recess at 1:07 p.m. and resumed at

3         1:09 p.m.)

4              THE COURT:  Okay.  Back on the record.  Please be

5    seated.

6              All right.  Does counsel want to wish -- wish to

7    bring up anything before the Court at this time?

8              MS. MARTINEZ:  Your Honor, the only issue that I have

9    to make a record of is the fact that plaintiff elicited or made

10   a statement that any judgment would be paid by the City of

11   Albuquerque, and I object to it because -- and I didn't make a

12   speaking objection because I didn't want to draw attention to

13   it in front of the jury, but I am going to need some time to

14   research that issue and find out what the cure to that

15   statement was.

16             THE COURT:  Yes, ma'am.  Okay.  And I sustained the

17   objection, but I'll entertain anything else you might have as

18   to curing --

19             MS. MARTINEZ:  Thank you, Your Honor.

20             THE COURT:  -- with a limiting instruction or

21   anything to that extent.  But before we go on with that,

22   Ms. Oliveros, what is -- what's the thought process in asking a

23   question about whether the City would be the party or the

24   entity that pays on the judgment or any sort of, well, payment

25   as a result of this lawsuit?

1          MS. OLIVEROS:  Well, Your Honor, the testimony was

2    about the City and the settlement with the City about his

3    termination related to this lawsuit, and there was no motion

4    in limine on it, and I think it seemed to me that it was

5    relevant to also ask about his -- you know, the City would be

6    paying for this lawsuit.  It just settled with him on the

7    termination that came up with this lawsuit, so I think it's

8    relevant to that.  And their motive to -- the City's motive to

9    change the facts of this case is relevant to his testimony and

10   his relationship with the City.

11         THE COURT:  Okay.  Okay.  Let me note, the jury

12   should be ready to come on in, but before I call them in or

13   even line them up I'm going to want a few minutes with

14   Ms. Oliveros and Ms. Martinez, just the attorneys, Ms. Oliveros

15   and Ms. Martinez.  So I'm going to close the courtroom for this

16   brief -- very brief meeting that I'm going to have with the

17   attorneys, so for a few minutes I'll just ask everybody in the

18   public gallery to step out for the moment.

19         MS. OLIVEROS:  Our staff?

20         THE COURT:  Yes.

21       (People from the courtroom were cleared from the

22       courtroom.  Courtroom sealed.)

23       (Separate transcript of sealed portion.)

24   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

25

1                          I N D E X

2       EXAMINATION                                    PAGE

3    PLAINTIFF'S WITNESS ANDY FITZGERALD

4         Direct Examination by Ms. Oliveros              3

5                          I N D E X

6

7    EXHIBITS                            IDENTIFIED/ADMITTED

8    Plaintiff's Exhibit 16                              46

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5         I, Danna Schutte Everett, RPR, CCR, CRR, Official

6    Court Reporter for the State of New Mexico, do hereby

7    certify that the foregoing pages constitute a true

8    transcript of proceedings had before the said Court held

9    in the city of Albuquerque, New Mexico, in the matter

10   therein stated.

11        In testimony whereof, I have hereunto set my hand on

12   this 4th day of June, 2019.

13

14        _____
                  DANNA SCHUTTE EVERETT
15                Registered Professional Reporter
                  Registered Merit Reporter
16                Certified Realtime Reporter
                  NM Certified Court Reporter #139
17                100 Church Street
                  Las Cruces, New Mexico  88001
18                Phone:  (575) 528-1656
                  Fax:  (575) 528-1645
19                dannadawn@comcast.net

20

21

22   May 28, 2019, Hernandez vs. Fitzgerald

23

24

25